UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| RUDERMAN FAMILY FOUNDATION,<br><br>Plaintiff,<br><br>v.<br><br>JUBILARIA MEDIA LLC and GREGORY HADDOCK,<br><br>Defendants. | Civil Action No. _____ |

## COMPLAINT

Plaintiff Ruderman Family Foundation ("RFF") brings this complaint against Defendants Jubilaria Media LLC and Gregory Haddock, and alleges as follows:

### Preliminary Statement

1. Antisemitism takes many forms, from blatant displays to insidious tropes embedded in American socio-political rhetoric.[1] RFF brings this action under federal and state civil rights laws, seeking injunctive and monetary damages to remedy the harm caused by the Defendants' discriminatory conduct and refusal to contract based on impermissible considerations of race, ethnicity, and national origin.

2. The Ruderman Family Foundation is a non-profit, private philanthropic organization which operates in the United States and also grants philanthropic funds to organizations in Israel. It has two main areas of focus: (*i*) the mental health of young adults; and (*ii*) strengthening the relationship between Israel and the American Jewish community through strategic philanthropy.

---

[1] *Antisemitism*, S. POVERTY. L. CTR., https://www.splcenter.org/resources/extremist-files/antisemitism/ (last visited Oct. 23, 2025).

1

3. RFF also produces the award-winning podcast "All About Change," hosted by Jay Ruderman (the "Podcast").

4. The Podcast broadly focuses on stories of activism, inclusion, courage and social justice—especially through the lens of individuals who have faced adversity and turned that adversity into meaningful societal and personal impact. As explained on the Podcast's website, "Ultimately, this is a show about hope."

5. In early 2025, RFF began looking for a new production company to assist with the Podcast's production and marketing.

6. Jubilaria Media LLC ("Jubilaria") and its principal, Gregory Haddock, produce podcasts and other online media. After an introduction between the parties, RFF partnered with Jubilaria to produce a test episode for the Podcast and social media assets to promote the episode.

7. This test episode and related content was successful, and RFF explained that it was ready to enter into a longer-term contract with Jubilaria to produce the Podcast on a regular basis.

8. In connection with these discussions, RFF discussed its process for vetting guests and topics for the Podcast, highlighted its objections to antisemitic rhetoric, and requested that any guests Jubilaria sourced for the Podcast would be vetted to avoid hosting individuals holding antisemitic viewpoints or who denied the right of existence for the Jewish people or the State of Israel.

9. After that discussion, the Defendants abruptly declined to meet or contract with RFF, citing the Defendants' stance on the "native people" and culture of Palestine. This

invocation of the Palestinian-Israeli conflict as a justification for halting production of the Podcast reveals the Defendants' unlawful grounds for refusing to contract with RFF.

## Parties

10. Plaintiff Ruderman Family Foundation is a non-profit, private philanthropic foundation located in Newton, Massachusetts. It is actively engaged in grant making to organizations in the State of Israel.

11. Defendant Jubilaria Media LLC is a limited liability company organized under the laws of the State of Delaware, with a registered agent located at 14 Lynnbroom Lane, Dover, Delaware 19904, c/o Brittany Michelle Terrell. Upon information and belief, no members of Jubilaria are citizens of the Commonwealth of Massachusetts.

12. Defendant Gregory Haddock ("Haddock") is an individual resident of the State of Colorado and a member and manager of Jubilaria.

## Jurisdiction and Venue

13. The Court has subject-matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because RFF asserts a claim arising under federal law, as well as supplemental jurisdiction over Plaintiff's state-law claims under 28 U.S.C. § 1367(a).

14. In the alternative, this Court has subject-matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs and is between citizens of different states.

15. Venue is proper in the U.S. District Court for the District of Massachusetts (Eastern Division) pursuant to 28 U.S.C. § 1391(b) because all or a substantial part of the events or omissions giving rise to RFF's claims occurred in this District (Middlesex County).

16. This Court has personal jurisdiction over the Defendants. They have reached out to the Commonwealth of Massachusetts with the intention of doing business there and have purposely availed themselves of the laws of the Commonwealth of Massachusetts, including but not limited to offering and selling services in the Commonwealth of Massachusetts and the District of Massachusetts; engaging in wrongful conduct with foreseeable injurious effects within the Commonwealth of Massachusetts and the District of Massachusetts; and otherwise voluntarily submitting to the jurisdiction of Massachusetts courts.

## Facts Common to All Counts

### *Ruderman Family Foundation*

17. RFF, established in 2002, is a private philanthropic foundation established in Newton, Massachusetts.

18. Initially, RFF recognized an issue with the exclusion of children with disabilities in Jewish day schools in the Boston area, which drove its engagement for over two decades in disability and inclusion work, viewing disability rights as civil rights.

19. In past years, RFF has expanded its mission to include mental health and emotional wellbeing through efforts to reduce stigma, increase access, and promote awareness of these issues among youth and in higher education.

20. RFF also is devoted to strengthening the ties between the American Jewish community and Israel, including through educating Israeli leaders, public servants, media, and agents of social change about the American Jewish experience, and prompting meaningful dialogue between these two communities.

21. Currently, RFF operates in the United States and Israel in two main areas of focus: (a) the mental health of young adults; and (b) strengthening the relationship between Israel and the American Jewish community through strategic philanthropy.

22. The RFF's mission statement explains that:

> Guided by our Jewish values, we work to end the stigma surrounding mental health and promote emotional well-being for all; foster a more nuanced understanding of the American Jewish community among Israeli leaders; and model the practice of strategic philanthropy worldwide.

23. In furtherance of its mission, RFF supports white papers, original research, and various events and advocacy efforts concerning disability inclusion, mental health, Israel-American Jewish relations, and other innovative philanthropy. RFF also leads and funds the annual Morton E. Ruderman Award in Inclusion and the Ruderman Seal of Approval for Authentic Representation, which is awarded to television and film projects featuring actors with disabilities in substantial roles.

24. RFF also produces and funds scripted and documentary films and series focused on social justice through its Boston Rose initiative in the United States and Israel.

### *The Podcast "All About Change"*

25. In addition to these endeavors, RFF produces the award-winning podcast "All About Change," hosted by Jay Ruderman.

26. The Podcast broadly focuses on stories of activism, inclusion, courage and social change—especially through the lens of individuals who have faced adversity and turned that adversity into meaningful societal and personal impact. As explained on the Podcast's website, "Ultimately, this is a show about hope."

27. The diverse range of topics covered on the Podcast include disability rights, youth mental health and advocacy, prison reform, grassroots activism and systemic social justice

issues, refugee empowerment, migration issues, community health, animal rights, environmental issues, combating racism and anti-discrimination/antisemitism, and stories of personal transformation.

### *Jubilaria Engages with RFF to Produce a Podcast Episode*

28. In or about February 2025, RFF began looking for a new production company for the Podcast.

29. After outreach from the Podcast's Managing Producer (the "<u>Producer</u>"), Jubilaria pitched its full-service podcast production and marketing services to RFF.

30. By April 2025, Jubilaria had familiarized itself with the Podcast and RFF.

31. After discussions with the Producer, Jubilaria expressed excitement to partner with RFF. Haddock wrote "[i]t's rare to find teams working toward the same type of mission, and it was energizing to hear how aligned we are on values, storytelling, and impact." These discussions continued through May and June 2025.

32. By the end of June 2025, the parties entered into an Agency Client Agreement and a Statement of Work for a test episode of the Podcast and social media assets about the episode. The parties' expectation was that the test episode would allow them to produce an episode of the Podcast together, which could lead to a longer-term contractual relationship for additional episodes.

33. From August 2025 until the first week of September 2025, the parties planned, recorded, and finalized a test episode of the Podcast, along with social media and marketing content. Both parties considered this a successful episode and partnership, and they expressed enthusiasm and excitement about entering into a long-term relationship to continue producing episodes of the Podcast.

*After RFF Raises Concerns about Antisemitism,
Defendants Refuse to Enter into a Contract for the Podcast*

34. On September 12, 2025, the Producer provided edits to the test Podcast and explained that "once we finalize the [Podcast] assets, we'd like to arrange a meeting to align values, intentions, and process. It has been a very hard time for the [RFF], so we'd definitely like to discuss Antisemitism. Also, [Mr. Ruderman] is really looking to work with a team of people that are excited about the podcast." This was the first time that RFF expressed its concerns with antisemitism to Jubilaria and Haddock.

35. On the same day, Haddock, on behalf of Jubilaria, responded. He acknowledged the email and agreed that a "[m]eeting sounds good!"

36. On September 19, 2025, the Producer contacted Jubilaria and explained that the RFF was interested in moving the Podcast's production services to Jubilaria and requested a meeting and draft contract for review.

37. On the same day, Haddock, on behalf of Jubilaria, responded that he was "equally thrilled and honored" to partner with the Podcast, that he would provide a draft contract, and that he would propose times for a meeting with the RFF.

38. In mid-September, the Producer spoke with Haddock and explained that RFF wanted guests for the Podcast vetted to avoid individuals who were antisemitic or who denied the right of existence for the Jewish people or the State of Israel. The Producer also requested that Jubilaria vet prospective guests' social media before recommending them to the Podcast.

39. And then, silence from Jubilaria.

40. After no further response from Haddock, the Producer contacted Jubilaria on September 25, 2025 for an update. Haddock responded that he would be back in touch "asap."

41. Four days later, on September 29, 2025, Haddock emailed a letter to the Producer and multiple employees of the RFF, stating that Jubilaria was unable to partner with the RFF. The letter attached to this email (the "September 29 Letter") stated, among other things, that Jubilaria "has made the decision not to work with the RFF."

42. While acknowledging RFF's "love of activism and advancement of social issues …," Jubilaria and Haddock explained in the September 29 Letter that they were refusing to contract and work with RFF because they "… must take a stance on the occupation of Palestine and its people." The Defendants failed to explain in the September 29 Letter how refusing to work with RFF was in any way connected or related to the "occupation" or Palestine.

43. It is telling that that the September 29 letter attempted to disclaim any antisemitic intent from Haddock and Jubilaria, but lectured RFF that "… the arc of justice will side with those … who will not remain silent in the midst of the destruction of the native people and culture of Palestine." Again, the Defendants failed to explain in the September 29 Letter how refusing to work with RFF was in any way connected or related to the "native people and culture of Palestine."

44. RFF never expressed to Jubilaria that it would pursue Podcast topics that were hostile to Palestine or to people who live in Gaza or the West Bank.

45. Nonetheless, once the Producer expressed to Haddock and Jubilaria that guests who expressed antisemitism would need to be avoided, Haddock completely changed the tone of his communications and invoked the Palestinian-Israeli conflict as a justification for halting production of the Podcast and refusing to contract with RFF.

46. Haddock's statements on behalf of Jubilaria in the September 29 Letter also falsely implied that Jews were not "native" to the Land of Israel[2] – despite a Jewish presence in that same area since at least the second millennium BCE.[3]

47. As demonstrated by the content on its website and the Podcast, RFF has not engaged in specific advocacy concerning Palestine. However, RFF is guided by its Jewish values and supports connections between the American Jewish community and Israel.

## *Manifestations of Antisemitism are Insidious and Increasingly Common*

48. Each year, the Anti-Defamation League ("ADL") tracks incidents of antisemitic harassment, vandalism and assault in the United States. From 2020 through 2025, the ADL tracked a 344% rise in antisemitic incidents across the United States, and an 893% increase of the past 10 years. "It is the highest number on record since ADL began tracking antisemitic incidents 46 years ago."[4]

49. The federal government defines antisemitism according to the Working Definition of Antisemitism promulgated by the International Holocaust Remembrance Alliance ("IHRA"), an intergovernmental organization that includes over thirty-five countries.[5] IHRA defines antisemitism as "a certain perception of Jews, which may be

---

[2] *Land of Israel*, WIKIPEDIA, https://en.wikipedia.org/wiki/Land_of_Israel (last visited Oct. 23, 2025).

[3] *History of the Jews and Judaism in the Land of Israel*, WIKIPEDIA, https://en.wikipedia.org/wiki/History_of_the_Jews_and_Judaism_in_the_Land_of_Israel (last visited Oct. 23, 2025).

[4] Ctr. on Extremism, *Audit of Antisemitic Incidents in 2024*, ANTIDEFAMATION LEAGUE (Apr. 22, 2025), https://www.adl.org/resources/report/audit-antisemitic-incidents-2024 (last visited Oct. 23, 2025).

[5] *See Defining Antisemitism*, U.S. DEP'T OF STATE, https://www.state.gov/defining-antisemitism/ (last visited Oct. 23, 2025).

9

expressed as hatred toward Jews. Rhetorical and physical manifestations of antisemitism are directed toward Jewish or non-Jewish individuals and/or their property, toward Jewish community institutions and religious facilities."[6]

50. The IHRA includes the following on its non-exhaustive list of "contemporary examples of antisemitism":

- Denying the Jewish people their right to self-determination, e.g., by claiming that the existence of a State of Israel is a racist endeavor;"

- "Applying double standards by requiring of [Israel] a behavior not expected or demanded of any other democratic nation;" and

- "Holding Jews collectively responsible for actions of the state of Israel."

51. The U.S. State Department views the IHRA Working Definition of Antisemitism as "integral to the fight to eliminate th[e] scourge" of antisemitism.[7]

52. Consistent with the IHRA examples, it is widely recognized that antizionism is a form of antisemitism. While criticism of particular policies of the Israeli government may not rise to the level of antisemitism, the demonization and delegitimization of the Jewish people's historic, national, and cultural connection to the land of Israel, as well as the Jewish people's right to self-determination in their ancestral homeland, does constitute antisemitism.[8]

53. Similarly, Merriam-Webster's Dictionary defines anti-Semitism as "hostility toward or discrimination against Jews as a religious, ethnic, or religious group."

---

[6] *See id.*

[7] Press Statement, Ned Price, Dep't Spokesperson, U.S. Dep't of State, *The International Holocaust Remembrance Alliance Working Definition of Antisemitism*, U.S. DEP'T OF STATE (Nov. 4, 2022), https://2021-2025.state.gov/the-international-holocaust-remembrance-alliance-working-definition-of-antisemitism/ (last visited Oct. 23, 2025).

[8] Special Envoy To Monitor and Combat Anti-Semitism, *Defining Anti-Semitism*, U.S. DEP'T OF STATE (June 8, 2010), https://2009-2017.state.gov/j/drl/rls/fs/2010/122352.htm (last visited Oct. 23, 2025).

10

54. Commitment to the existence of a Jewish state, separate and apart from any specific government or political party, is a part of the cultural ethnic identity of many Jewish people.

55. Even facially neutral words and phrases can be highly probative of discriminatory intent depending on the circumstances and social content in which that are communicated.

56. Here, RFF's proactive efforts to discuss the parties' anticipated contractual relationship included legitimate concerns over avoiding guests on the Podcast who expose or hold antisemitic viewpoints. This concern was natural outgrowth of RFF's identity, activities, and mission statement, *supra*.

57. In response, the Defendants refused to enter into a contractual agreement with RFF due to their references to Palestine and purported allegiance with the "native" people of that areas; thus, implying falsely that such people did not include Jews. This response evidences that Jubilaria's refusal to contract was based, in whole or in part, on its perceptions and biases about RFF as a Jewish and Israeli-supporting organization.

## COUNT I
**(Discrimination in Violation of 42 U.S.C. § 1981)**

58. RFF incorporates the foregoing paragraphs as if set forth fully herein.

59. A substantial number of RFF's employees are Jewish and Israeli, and RFF is expressly a Jewish organization and associated with Israel.

60. Under the Civil Rights Act of 1866, 42 U.S.C. § 1981, as amended ("Section 1981"), discrimination based on race is prohibited.

61. Section 1981 guarantees that all persons within the United States have the equal right to make and enforce contracts without regard to race.

62. Section 1981 protects Jewish people from racial discrimination.

63. Defendants discriminated against RFF by refusing to enter into a contract concerning the Podcast based on the race of RFF and its principals and employees.

64. RFF seeks all damages to which it is entitled under Section 1981, including consequential damages, compensatory damages, punitive damages, attorneys' fees, interest, and costs.

## COUNT II
### (Discrimination in Violation of Mass. Gen. Laws c. 93 § 102)

65. RFF incorporates the foregoing paragraphs as if set forth fully herein.

66. Under Chapter 93, Section 102 of the Massachusetts General Laws ("Section 102"), all persons within Massachusetts, regardless of sex, race, color, creed or national origin, have equal rights to make and enforce contracts.

67. A substantial number of RFF's employees are Jewish and Israeli, and RFF is expressly a Jewish organization and associated with Israel.

68. Section 102 protects Jewish people from racial discrimination.

69. Section 102 protects individuals from discrimination based on their national origin–including Israelis.

70. Defendants discriminated against RFF by refusing to enter into a contract concerning the Podcast based on the race and national origin of RFF and its principals and employees.

71. RFF seeks all damages to which it is entitled under Section 102, including consequential and exemplary damages, and attorneys' fees, interest, and costs.

## COUNT III
### (Unfair and Deceptive Trade Practices in Violation of Mass. Gen. Laws c. 93A)

72. RFF incorporates the foregoing paragraphs as if set forth fully herein.

73. Defendants are engaged in trade or commerce for purposes of M.G.L. c. 93A, §§ 2, 11.

74. Defendants' acts and omissions alleged in this Complaint constitute unfair and deceptive trade practices in violation of M.G.L. c. 93A §§ 2, 11, all of which occurred within or were directed to the Commonwealth of Massachusetts. Such actions and omissions include, without limitation, Defendants' refusal to contract with RFF for the discriminatory and unlawful reasons described above.

75. Defendants' unfair and deceptive trade practices were willful and intentional.

### Request for Relief

WHEREFORE, RFF respectfully requests that this Court award the following relief:

A. Judgment in favor of RFF on all counts of its Complaint;

B. Enter appropriate injunctive relief against Defendants;

C. Award RFF compensatory damages;

D. Award RFF punitive damages, including such damages of no less than twice and no more than triple its actual damages;

E. Award RFF its attorneys' fees and costs incurred in this action; and

F. Award RFF such other and further relief as this Court deems just and proper.

### Demand for Jury Trial

RFF demands a trial by jury in this action of all issues so triable in accordance with Federal Rule of Civil Procedure 38.

Respectfully submitted,

RUDERMAN FAMILY FOUNDATION
By its attorneys,

*/s/ Matthew P. Horvitz*
Matthew P. Horvitz (BBO #664136)
GOULSTON & STORRS PC
One Post Office Square
Boston, MA 02109
(617) 674-4053
mhorvitz@goulstonstorrs.com

Dated: October 23, 2025